UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW R. PEREZ,<br><br>Plaintiff,<br><br>v.<br><br>R. BINKELE, et al.,<br><br>Defendants. | Case No. 18-cv-04856-SI<br><br>**ORDER OF SERVICE**<br>Re: Dkt. No. 1 |

Matthew Robert Perez, an inmate currently housed at Salinas Valley State Prison, filed this *pro se* prisoner's civil rights action under 42 U.S.C. § 1983. The complaint is now before the court for review pursuant to 28 U.S.C. § 1915A.

## BACKGROUND

Matthew Perez was suspected of having obtained contraband from his girlfriend through a contact visit. In this action, he complains about the efforts of prison officials and others to retrieve that contraband. The complaint alleges the following:

<u>Events on July 31, 2016</u>: Investigative service unit (ISU) officers Franco and Salgado reported that they saw Perez's girlfriend pass an unknown object about two inches in length from her mouth to Perez's mouth while kissing him during visitation hours at Salinas Valley State Prison on July 31, 2016.

The administrative officer of the day authorized Perez to be put on contraband watch. Perez was strip-searched, including having his oral and anal cavities searched; no contraband was found. He then was evaluated by medical staff and given the option of being x-rayed to determine if there was contraband in him or providing three clean bowel movements while under contraband watch.

Perez chose the latter. Chief Deputy Warden Binkele authorized a hand isolation device to be used during the contraband watch.[1] Perez was put in a makeshift holding cell that had overhead lights that remained on for the duration of his stay, a two-foot bench, and no working toilet or sink. Perez's boxer shorts were taped at the waist and thighs, and he was put in a jumpsuit that also was taped around the ankles, waist and arms. He also was in waist restraints and in the hand isolation devices.

Perez, who has an eye disease necessitating medication and hard contact lenses, asked for his medication as well as his contact lenses and contact lens solution (collectively referred to by him as his "medical appliances," *id.* at 10). A correctional officer said he would look into the matter.

At about 2:30 p.m., ISU officers Salgado and Franco visited Perez and tried to get him to confess to possessing drugs. They threatened him that he might die in the cell if the drugs in him were not wrapped correctly. Perez declined to speak, except to invoke his right to remain silent and request his medical appliances and medication, which the officers disregarded.

At about 9:00 p.m., Perez was given a mattress, but no blanket. Docket No. 1 at 10. He also was given his medication and medical appliances. Perez used the medication and removed his contact lenses.

Events on August 1, 2016: A nurse visited at about 7:00 a.m. and took away the medications and medical appliances over Perez's protests. She returned them a half hour later saying that the doctor said Perez was allowed to have them. One of the contact lenses was missing, and the nurse denied that she had done anything wrong. (It was three months before the lens that "negligently" had been lost was replaced. *Id.* at 24.)

At about 10:00 a.m., ISU officers Salgado, Franco and Peffley visited Perez and tried to get him to confess to possessing drugs. Peffley violently lifted Perez to his feet by his waist chains and shook the restraints. The ISU officials returned about 15 minutes later and put on another jumpsuit backwards over the one he was wearing and taped the jumpsuit very tightly around his waist, legs and arms before replacing the waist restraints. Later Perez complained to an officer on duty the tape

---

[1] The complaint does not describe the "hand isolation device." One case described the hand isolation devices as resembling golf club covers. *See Fletcher v. Swarthout*, 2016 WL 6135870, *2 (E. D. Cal. 2106).

2

was too tight, but obtained no relief.

Events on August 2, 2016: At about 7:30, Perez informed a correctional officer that he had no feeling in his legs due to the tightly wrapped tape around his waist and legs. The officer removed the clothing and tape to reveal that Perez's legs were turning purple. ISU officer Peffley arrived and said "that's what he gets" when the officer told him he cut off the tape that had been cutting into Perez's legs. The correctional officer provided fresh underclothing, re-taped up Perez's shorts and jumpsuits, and re-applied the waist restraints and hand isolation devices.

Later that afternoon, ISU officers Peffley and Wilson put leg restraints on Perez without explanation. The leg restraints were authorized by warden Binkele.

At about 9:00 a.m., Perez "collapsed while showering." *Id.* at 13. He attributes his collapse to the conditions of confinement. He was taken in an ambulance to the correctional treatment center and "given a shot of 'Narcan' for a drug overdose even though [he] expressly stated these symptoms had no relation to any type of drug overdose." *Id.* He next was taken by ambulance to Natividad Medical Center where he received treatment while in restraints and his clothes taped shut. Warden Binkele authorized a 72-hour extension of the contraband watch.

Events on August 3, 2016: At about 1:00 p.m., ISU officers Salgado and Franco attempted to coerce Dr. Laico at Natividad Medical Center to order x-rays. She declined and instead ordered urinalysis testing and laxatives, and had Perez admitted overnight for observation. Over the next day, Perez provided seven bowel movements, all of which were negative for contraband.

Events on August 4, 2016: Perez was released from the hospital and returned to Salinas Valley. He was returned to the contraband watch cell, despite his demands to be released from contraband watch. Later that night, ISU officers Franco and Salgado again tried to get him to confess and threatened him. Perez remained silent.

Events on August 5, 2016: Perez refused ISU lieutenant Moore's request to submit to x-rays. Lt. Moore then said that a search warrant would be obtained. At about 5:12, Perez was taken to Natividad Medical Center.

At the hospital, Perez was dragged by the ISU officers into the emergency room and strapped to a gurney by ISU officers Peffley and Salgado, under the supervision of lieutenant Moore. X-rays

and CT-scans then were done against Perez's wishes.

About ten minutes later, nurse Jane Doe SBC attempted to give Perez an IV in his arm. The needle stick was painful, and it took her 3-4 attempts to succeed. Perez then felt burning pain in his arm and his vein swelled up from the IV drip because blood flow in his arm was constricted by the tape wrapped around his arm to secure the jumpsuit.

About 25 minutes later, Dr. Jeffrey Bass talked to lieutenant Moore and said he saw "'five foreign bodies' in the plaintiff's 'anal cavity' that were 'unobstructed' and 'would be able to come out on [] their own." *Id.* at 19. Dr. Bass refused the request of lieutenant Moore to physically remove the objects due to medical risks, even though Moore said he had a search warrant that authorized the removal of foreign bodies. Dr. Bass prescribed a laxative to "'let nature take its course'" and the objects would come out naturally. *Id.* at 20.

About 15 minutes later, nurse Jane Doe SBC entered the room with large containers of laxatives and began pouring the liquid into Perez's mouth, telling him he needed to continue drinking the laxative, cup by cup, until all of the dose was gone. (Perez apparently would not or could not drink on his own because he was in restraints.) When he said he was not ready for more after the first cup, the nurse left and returned a few minutes later to administer another cup; this process was repeated at least seven times in ten minutes. Eventually, Perez said he could drink no more without throwing up. When the nurse left and the sleep-deprived Perez closed his eyes, ISU officer Peffley yelled at him to try to keep him awake.

Nurse Jane Doe SBC returned to see what the noise was about and gave the laxative to Peffley to administer to Perez. Peffley then "began forcibly pouring the laxative into the plaintiff's mouth until the plaintiff began coughing and choking on the liquid." *Id.* at 22. He did this 6-7 times.

Events on August 6, 2016: Lieutenant Moore advised his officers that the hospital was not going to admit Perez overnight and that he would need to be taken back to Salinas Valley. Moore also learned, however, that the chief medical officer would not allow Perez back to the prison in his current condition. Moore then spoke with nurse Jane Doe SBC.

Nurse Jane Doe SBC then came into the room and told Perez that she would administer enemas for him. Perez protested. ISU officers Salgado and Peffley then grabbed Perez, pulled off his clothes and bent him over the table while nurse Jane Doe SBC administered enemas without lubrication. This tore Perez's anus and caused it to bleed. The enemas and subsequent bowel movements were performed in front of a room full of officers, some female. Once it was determined that Perez was "contraband free," he was returned to Salinas Valley. *Id.* at 24.

**DISCUSSION**

A federal court must engage in a preliminary screening of any case in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity. See 28 U.S.C. § 1915A(a). The court must identify any cognizable claims, and dismiss any claims which are frivolous, malicious, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. *See id*. at § 1915A(b)(1),(2). *Pro se* complaints must be liberally construed. *See Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

The complaint raises issues in three different areas: (1) whether a hearing necessary before contraband watch commenced; (2) whether a contraband watch generally violates the inmate's rights; and (3) whether the manner in which this particular search for contraband was conducted violated the inmate's rights. Only the third area gives rise to possible claims.

Perez had no federally protected right to due process before the contraband watch began. "An investigative contraband watch is the type of condition that is ordinarily contemplated by the sentence imposed." *Chappell v. Mandeville*, 706 F.3d 1052, 1063 (9th Cir. 2013). A temporary contraband watch does not rise to the level of an extreme change in the condition of confinement so as to give rise directly to a claim under the Due Process Clause and does not amount to an "atypical and significant hardship." *See id.* at 1063-65 (citing *Sandin v. Conner*, 515 U.S. 472 (1995) and

concluding that defendants were entitled to qualified immunity due to absence of clearly established law on point). The placement of Perez on contraband watch for seven days without a hearing did not violate due process.

A contraband watch does not *per se* violate an inmate's constitutional rights. In *Chappell v. Mandeville*, 706 F.3d 1052 (9th Cir. 2013), the Ninth Circuit held that correctional officers involved in a California inmate's week-long contraband watch were entitled to qualified immunity because there was no clearly established law that such placement violated the Eighth Amendment. That inmate was, among other things, put in double clothing and waist chains, kept in a cell under constant lighting, and had his bodily functions monitored. Since *Chappell*, the Ninth Circuit has not ruled whether the contraband watch program is unconstitutional. *See, e.g., Hinkley v. Vail*, 616 F.App'x 274, 274 (9th Cir. 2015) (defendants entitled to qualified immunity on 4th and 14th Amendment claims "because it would not have been clear to every reasonable prison official that placement in an 84-hour contraband watch and warrantless searches for contraband, after discovery of contraband following an extended family visit were unlawful"). The constitutionality of the CDCR's contraband watch in general remains as unsettled today as it did at the time of the contraband watch used in *Chappell* . Because of this, defendants have qualified immunity against a claim for the simple placement of Perez on contraband watch. The claims based on the placement of Perez on contraband watch are dismissed. *See* 28 U.S.C. § 1915A(b)(2) (court may dismiss any part of the complaint that "seeks monetary relief from a defendant who is immune from such relief"). This dismissal includes the claims against assistant warden Binkele, who allegedly authorized the extension of the contraband watch, the use of leg restraints and the use of hand isolation devices. Concluding that the contraband watch program does not *per se* support liability for defendants does not fully resolve the matter because much of the complaint concerns the particular ways in which some defendants attempted to get the contraband while Perez was on contraband watch.

The complaint states cognizable claims against the ISU officials (Moore, Salgado, Franco, and Peffley) as well as Dr. Bass and nurse Jane Doe for Fourth Amendment violations based on their activities on August 5-6, 2016. The Fourth Amendment requires that a nonconsensual physical search of a suspect's body be reasonable. *See George v. Edholm*, 752 F.3d 1206, 1217-18 (9th Cir.

6

2014) (forced sedation, anoscopy, intubation, and bowel evacuation to remove a baggie of cocaine base from arrestee's rectum); *cf. Rochin v. California*, 342 U.S. 165 (1952) (police conduct which involved forcing the mouth of a suspect open to retrieve swallowed pills and then forcibly pumping his stomach violated due process). Liberally construed, cognizable Fourth Amendment claims are stated against these defendants for their alleged participation in causing Perez to be unwillingly subject to x-rays, CT-scans, laxatives, and enemas used to retrieve contraband it was believed he had swallowed.

An Eighth Amendment claim is stated against ISU officials Moore, Salgado, Franco, and Peffley for causing Perez to be subjected to constant lighting during the contraband watch. *See Grenning v. Miller-Stout*, 739 F.3d 1235 (9th Cir. 2014) (summary judgment based on qualified immunity should not have been granted to prison officials where inmate-plaintiff presented evidence that he was exposed to constant lighting for 13 days). The allegation that the ISU officials supposedly controlled the contraband watch plus the allegation of continuous lighting therein are adequate, when liberally construed, to link them to this Eighth Amendment claim.

A claim is not stated against ISU officials Salgado and Franco for allegedly applying the tape too tightly to Perez's body because there are no allegations that they were aware that the tape was too tight. The Eighth Amendment imposes duties on prison officials to provide prisoners with the basic necessities of life, such as food, clothing, shelter, sanitation, medical care, and personal safety. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A plaintiff alleging that conditions of confinement amount to cruel and unusual punishment prohibited by the Eighth Amendment must satisfy a two-prong test. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). First, a plaintiff must satisfy an objective test showing that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, courts consider the circumstances, nature, and duration of the deprivation. *See Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). Second, the plaintiff must show that the prison official inflicted the deprivation with a "sufficiently culpable state of mind," that is, with "deliberate indifference" to his health or safety. *Farmer*, 511 U.S. at 834. The deliberate indifference standard requires that the

7

official know of and disregard an excessive risk to inmate health or safety. *See id.* at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *See id.* Assuming arguendo that tightly taped underwear and a jumpsuit amount to an objectively sufficiently serious condition, Perez does not allege that he told defendants or they otherwise were actually aware that that the tape was too tight on him. The allegation that Peffley was told that the tape was too tight also does not show deliberate indifference because, by the time he was told of that, the tight tape already had been removed. *See* Docket No. 1 at 12.

A claim is not stated based on the loss of Perez's contact lens by a prison nurse. Allegations that a plaintiff has been deprived of his property negligently or intentionally without a pre-deprivation hearing do not state a due process claim under § 1983 if the deprivation was random and unauthorized, *see Parratt v. Taylor*, 451 U.S. 527, 535-44 (1981) (state employee negligently lost prisoner's hobby kit), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 330-31 (1986); *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (intentional destruction of inmate's property), because California provides an adequate state post-deprivation remedy, *see Zinermon v. Burch*, 494 U.S. 113, 128-29 (1990) (where state cannot foresee and therefore provide meaningful hearing prior to deprivation, statutory provision for post-deprivation hearing or common law tort remedy for erroneous deprivation satisfies due process). The allegation that a nurse negligently lost one of Perez's contact lenses shows a random and unauthorized property deprivation that is not actionable under § 1983.

A claim is not stated against the ISU officials for their allegedly threatening comments to Perez during the contraband watch. Verbal harassment alone is not actionable under 42 U.S.C. § 1983. *See Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997), *overruled in part on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (directing vulgar language at prisoner does not state constitutional claim); *Burton v. Livingston,* 791 F.2d 97, 99 (8th Cir. 1986) ("mere words, without more, do not invade a federally protected right").

Finally, the defendant identified as nurse Jane Doe SBC presents a problem. Although the use of Doe defendants is acceptable to withstand dismissal of the complaint at the initial review stage, using Doe defendants creates its own problem: those persons cannot be served with process until they are identified by their real names. The court will not stall this action while Perez tries to learn the name of nurse Jane Doe SBC. Rather, Perez must promptly take steps to discover her true name and provide that information to the court in an amendment to his complaint so that she may be served with process. The burden remains on Perez; the court will not undertake to investigate the names and identities of unnamed defendants. Perez must provide the true name and identity of nurse Jane Doe within 120 days of the date of this order or she will be dismissed without prejudice to him filing another action against her.

**CONCLUSION**

1. Liberally construed, the complaint states a cognizable § 1983 claim against defendants Moore, Salgado, Franco, Peffley, Bass, and Jane Doe SBC for Fourth Amendment violations, and against defendants Moore, Salgado, Franco and Peffley for an Eighth Amendment violation. All other claims and defendants are dismissed.

2. The clerk shall issue a summons and the United States Marshal shall serve, without prepayment of fees, the summons, and a copy of the complaint, and a copy of this order upon the following defendants:

- ISU lieutenant E. Moore (at Salinas Valley State Prison)
- ISU officer R. Salgado (at Salinas Valley State Prison)
- ISU officer A. Franco (at Salinas Valley State Prison)
- ISU officer J. Peffley (at Salinas Valley State Prison)
- Dr. Jeffrey H. Bass (at Natividad Medical Center)

3. In order to expedite the resolution of this case, the following briefing schedule for dispositive motions is set:

 a. No later than **March 1, 2019**, defendants must file and serve a motion for summary judgment or other dispositive motion. If defendants are of the opinion that this case cannot be resolved by summary judgment, defendants must so inform the court prior to the date the motion is due. If defendants file a motion for summary judgment, defendants must provide to plaintiff a

9

new *Rand* notice regarding summary judgment procedures at the time they file such a motion. *See Woods v. Carey*, 684 F.3d 934, 939 (9th Cir. 2012).

        b.    Plaintiff's opposition to the summary judgment or other dispositive motion must be filed with the court and served upon defendants no later than **March 29, 2019**. Plaintiff must bear in mind the notice and warning regarding summary judgment provided later in this order as he prepares his opposition to any motion for summary judgment.

        c.    If defendants wish to file a reply brief, the reply brief must be filed and served no later than **April 12, 2019**.

    4.    Plaintiff is provided the following notices and warnings about the procedures for motions for summary judgment:

> The defendants may make a motion for summary judgment by which they seek to have your case dismissed. A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure will, if granted, end your case. . . . Rule 56 tells you what you must do in order to oppose a motion for summary judgment. Generally, summary judgment must be granted when there is no genuine issue of material fact -- that is, if there is no real dispute about any fact that would affect the result of your case, the party who asked for summary judgment is entitled to judgment as a matter of law, which will end your case. When a party you are suing makes a motion for summary judgment that is properly supported by declarations (or other sworn testimony), you cannot simply rely on what your complaint says. Instead, you must set out specific facts in declarations, depositions, answers to interrogatories, or authenticated documents, as provided in Rule 56(e), that contradict the facts shown in the defendants' declarations and documents and show that there is a genuine issue of material fact for trial. If you do not submit your own evidence in opposition, summary judgment, if appropriate, may be entered against you. If summary judgment is granted, your case will be dismissed and there will be no trial. *Rand v. Rowland*, 154 F.3d 952, 962-63 (9th Cir. 1998).

If a defendant files a motion for summary judgment for failure to exhaust administrative remedies, he is seeking to have the case dismissed. As with other defense summary judgment motions, if a motion for summary judgment for failure to exhaust administrative remedies is granted, the plaintiff's case will be dismissed and there will be no trial.

    5.    All communications by plaintiff with the court must be served on a defendant's counsel by mailing a true copy of the document to defendant's counsel. The court may disregard any document which a party files but fails to send a copy of to his opponent. Until a defendant's counsel has been designated, plaintiff may mail a true copy of the document directly to defendant,

10

but once a defendant is represented by counsel, all documents must be mailed to counsel rather than directly to that defendant.

6. Discovery may be taken in accordance with the Federal Rules of Civil Procedure. No further court order under Federal Rule of Civil Procedure 30(a)(2) or Local Rule 16 is required before the parties may conduct discovery.

7. Plaintiff is responsible for prosecuting this case. Plaintiff must promptly keep the court informed of any change of address and must comply with the court's orders in a timely fashion. Failure to do so may result in the dismissal of this action for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b). Plaintiff must file a notice of change of address in every pending case every time he is moved to a new facility.

8. Plaintiff is cautioned that he must include the case name and case number for this case on any document he submits to this court for consideration in this case.

**IT IS SO ORDERED**.

Dated: December 13, 2018

SUSAN ILLSTON
United States District Judge