1
2
3
4                            UNITED STATES DISTRICT COURT
5                          NORTHERN DISTRICT OF CALIFORNIA
6

7    MATTHEW R. PEREZ,                        Case No.  18-cv-04856-SI
8                    Plaintiff,
                                              **ORDER GRANTING MOTION FOR
9        v.                                   SUMMARY JUDGMENT**
10   E. MOORE, et al.,                        Re: Dkt. No. 40
11                   Defendants.

12
13
14                                 **INTRODUCTION**

15         Matthew Perez, an inmate at Salinas Valley State Prison, filed this *pro se* civil rights action

16   under 42 U.S.C. § 1983.  This action is now before the court for consideration of the motion for

17   summary judgment filed by defendants Franco, Moore, Peffley, and Salgado.  Perez opposes the

18   motion.  For the reasons discussed below, summary judgment will be granted in the moving

19   defendants' favor.

20

21                                 **BACKGROUND**

22         This action concerns prison officials' efforts to obtain contraband that they saw Perez ingest

23   during a visit with his girlfriend.  The claims remaining for adjudication are that defendants Franco,

24   Moore, Peffley, and Salgado (1) violated Perez's Eighth Amendment right to be free from cruel and

25   unusual punishment when they subjected him to continuous lighting during the contraband

26   surveillance watch that lasted six days, and (2) violated Perez's Fourth Amendment right to be free

27   from an unreasonable search as they took steps to hurry the contraband out of his system.  (Other

28   claims and defendants were dismissed in earlier orders, and are not further discussed.)

United States District Court
Northern District of California

The following facts are undisputed unless otherwise noted:

The events and omissions giving rise to this action occurred from July 31 to August 6, 2016. At the relevant time, Perez was a prisoner at the Salinas Valley State Prison in Soledad, California. The remaining defendants are correctional lieutenant Moore, correctional officer (C/O) Salgado, C/O Franco, and C/O Peffley.  Each of these correctional defendants worked in the Investigative Services Unit (ISU) at the prison.

### A. Perez Ingests Contraband During A Contact Visit

During a contact visit on July 31, 2016, Perez's girlfriend passed a capsule-shaped object about two inches in length from her mouth to Perez's mouth when they kissed.  Perez then took several drinks of water after the object passed to his mouth, apparently to aid in swallowing the object.  ISU officers Franco and Salgado witnessed the contraband being passed to Perez.  The passing of the contraband also was visible on surveillance video.   Salgado immediately instructed staff to handcuff Perez and escort his girlfriend out of the visiting room.  *See* Docket No. 40-7 at 3-4 (Salgado Decl.); Docket No. 40-4 at 3-4 (Franco Decl.); Docket No. 40-9 (surveillance video).

The girlfriend, Deanna Strickland, consented to a search of her person and surrendered a Ziploc bag containing a clear, rock-like substance.  Salgado tested the substance on the spot and received a positive result for methamphetamine.  In a recorded interview, Strickland told Franco that she picked up the drugs from an outside supplier, brought them to the prison, and transferred one package from her mouth to Perez's mouth while kissing him. *See* Docket No. 40-7 at 3-4 (Salgado Decl.); Docket No. 40-4 at 3-4 (Franco Decl.); *see also* Docket No. 40-9 (surveillance video recording); Docket No. 40-10 (interview video recording).

### B. The Quest To Recover The Contraband

#### 1. CDCR Procedures For Contraband Surveillance Watch

Regulations that apply to prisoners in the California Department of Corrections and Rehabilitation (CDCR) define "contraband" as "anything that is not permitted, in excess of the maximum quantity permitted, or received or obtained from an unauthorized source."  Cal. Code

Regs. tit. 15, § 3000 (2016).  Ingesting controlled substances, unless authorized by the prison's health care staff, is prohibited.  *Id.* at § 3016(a).  Possessing money also is prohibited.  *Id.* at § 3006(b).

According to C/O Salgado, it is common for inmates to hide contraband by ingesting it or placing it in their rectums as a means to avoid detection.  If a bindle of drugs is not wrapped properly, it can leak or explode inside an inmate who has swallowed it, resulting in overdose or death.  The presence of drugs in the prison can result in violence that is dangerous to inmates as well as to the correctional staff who must watch them: an inmate known to be in possession of controlled substances can be targeted by other inmates who want the drugs, and there can be violence related to collection of debts incurred to pay for the drugs.  Docket No. 40-7 at 2-3 (Salgado Decl.)

The CDCR's Operations Manual authorizes correctional staff to place an inmate on contraband surveillance watch (CSW) "[w]hen it becomes apparent through medical examination, direct observation, or there is reasonable suspicion that an inmate has concealed contraband in their body, either physically or ingested, and the inmate cannot or will not voluntarily remove and surrender the contraband."  Operations Manual at § 52050.23 (2016).  The purpose of CSW is to retrieve the contraband "without physical intrusion if possible; ensure that contraband is not circulated into the inmate population; and ensure the safety of the inmate."  *Id.*  Operations Manual § 52050.23.1 authorizes CSW for 72 hours, or until the inmate produces three contraband-free bowel movements.  The decision to place an inmate on CSW must be made by the on-duty watch commander or the administrative officer of the day.  The warden or chief deputy warden must approve restraints, extensions of the contraband watch, and any application for a search warrant.  Docket No. 40-7 at 4, 10 (Salgado Decl.).  It is "extremely rare for an inmate to withhold contraband" past the initial 72-hour period, but there are provisions in the operations manual to renew the 72-hour CSW period and obtain a search warrant if necessary.  *Id.* at 7.

The actual surveillance of an inmate on CSW is done by correctional officers, who are supervised by correctional sergeants.  Correctional officers are stationed directly outside the inmate's cell and must watch the inmate at all times.  ISU officers do not conduct the actual surveillance of inmates on CSW but do check in several times a day to learn things, such as whether

the inmate has produced the contraband, is taking meals, or is attempting to conceal the contraband until the CSW period is over.  They check the inmate's clothing to be sure he has not tried to retrieve the contraband and conceal it again by, e.g., re-ingesting it, hiding it in the cell or on a meal tray, or trying to flush it in the toilet.  *Id.* at 4-5.

An inmate on CSW is placed in a "controlled isolated setting . . . under constant visual observation" until the contraband is retrieved or voluntarily surrendered.  *Id.* at 10.  To prevent an inmate from retrieving or destroying the contraband, his hands (and, if necessary, his feet) are placed in restraints; and his clothing is taped at the wrists, waist and ankles.  *Id.*

### 2.  Lighting

The Eighth Amendment claim remaining for adjudication concerns the constant illumination of the cell in which Perez was kept for CSW.  The parties agree the lights remained on throughout the CSW.

The CDCR's Operations Manual provides that the cell's "lights should be dimmed, as possible, during normal hours of darkness, if such action does not adversely impact staff's ability to observe and monitor the inmate."  *Id.*  An inmate on CSW is issued a mattress and blanket at night, and may cover his eyes with the blanket as long as his hands are still visible.  Docket No. 40-7 at 5 (Salgado Decl.)

Proper lighting is essential to the success of the CSW, as the purpose of CSW is to constantly observe the inmate in order to recover the contraband.  Officers must document all events and inmate movements and do so, on average, in 15-minute increments.  (In Perez's case, there are dozens of pages of records of his activities and status checks during his stay on CSW.  Docket No. 40-11.) Constant lighting also is necessary for officers to maintain a visual watch of the inmate's hands at all times, so that it can be observed if, for example, he attempts to re-ingest the contraband or otherwise dispose of it.

Constant lighting also serves a safety purpose.  Inmates concealing contraband inside their bodies are at a heightened risk of serious harm or death, as has occurred with inmates who ingested controlled substances in packaging that allowed the substance to leak into their bodies.  If an officer

4

does not maintain a clear and constant visual watch of the inmate, a medical emergency – such as an unintentional overdose -- may not be timely detected.  *See* Docket No. 40-1 at 2 (Smith Decl.); Docket No. 40-5 at 4-5 (Moore Decl.).

### 3.  Perez's Stay on CSW

After Perez was observed on July 31 receiving the contraband during the kiss with his girlfriend, he promptly was escorted out of the visiting room, strip-searched, evaluated by medical staff, and put on CSW.[1]  Docket No. 36 at 13.  He remained on CSW from July 31 through August 6, when he was removed from CSW after he defecated the contraband.  During that time, he also made two trips to an outside hospital, Natividad Medical Center.

In the cell in which Perez did his CSW, the lights could be turned on or off with a switch outside the cell and unavailable to Perez; the lights could not be dimmed.  Docket No. 40-3 at 2 (Gallardo Decl.)  As noted earlier, the CDCR's Operations Manual provides that the cell's "lights should be dimmed, as possible, during normal hours of darkness, if such action does not adversely impact staff's ability to observe and monitor the inmate."  Docket No. 40-7 at 10.

During his stay in the cell, Perez did not voice any complaints about the condition of his cell, including the lighting.  Perez admitted in his deposition that he did not complain to any defendant about the lights.  Docket No. 40-12 at 57-58 (Perez Depo. RT 47-48).

It appeared to prison officials that Perez was taking extraordinary steps to avoid having the contraband found.  He refused most of the three meals offered to him each day.  He often declined offers of water.  He also often declined to urinate or produce a bowel movement when the opportunity was offered.  He did not produce a bowel movement between July 31 and August 3. Docket No. 40-7 at 5 (Salgado Decl.).

Defendants presented undisputed evidence that "[i]nmates often have an interest in prolonging producing a bowel movement, or otherwise manipulating bowel movements to prevent

---

[1] Perez states that an inmate suspected of having contraband has the option to be x-rayed instead of going on CSW.  Perez chose CSW.  Docket No. 36 at 13.

United States District Court
Northern District of California

United States District Court
Northern District of California

the contraband from being released." *Id.* at 5-6.   The supplier may target the inmate who relinquishes the contraband, and/or the inmate may become indebted to his suppliers and become a target of attack if he cannot pay. *Id.* at 6.

On August 3, Perez collapsed while taking a shower.  Docket No. 36 at 20.  Correctional officers immediately called medical staff, and Perez was taken to an outside hospital, Natividad Medical Center.  Before he was taken to the hospital, he was given a shot of Narcan, even though he denied that his symptoms were related to any sort of overdose. *Id.*  At Natividad, Perez refused an x-ray but agreed to take laxatives; he produced five to seven bowel movements, yet no contraband was included in the excrement.  Docket No. 36 at 22-24.  According to defendant Peffley, Perez "constricted his rectum and slowly excreted only liquid feces" to avoid defecating the contraband. Docket No. 40-6 at 6.  Perez was returned from the hospital to the prison the next day.

On August 3, the chief deputy warden approved a second 72-hour CSW for Perez.  This extension of CSW was based on these circumstances: Perez had been observed ingesting at least one bindle; his girlfriend admitted that she passed drugs from her mouth to Perez's mouth; Perez had eaten very little food and drank very little water during the first CSW period; and Perez had produced only limited, liquid bowel movements free of contraband after receiving laxatives.  The chief deputy warden also authorized Salgado to obtain a search warrant. *Id.* at 7.

Salgado obtained a search warrant from the Monterey County Superior Court.  Docket No. 40-7 at 13-18.  His affidavit of probable cause described the facts, including the ingestion of contraband by Perez, as well as the CSW efforts that had not yet yielded the contraband.  The affidavit proposed that the search be done at a hospital, where a "body cavity search will be conducted in a medically approved manner by a licensed physician or other licensed medical professional.  Said person(s) are authorized by this court to conduct a body cavity search of the above listed person without their consent.  Said search does not include surgical procedures accomplished with scalpels, but is rather a probing type of search. [] The term body cavity within the meaning of this warrant shall constitute the mouth, digestive tract, and or anus of inmate Perez." *Id.* at 17-18 (errors in source; brackets added).  The search warrant, signed by a judge of the Monterey County Superior Court on August 5, authorized a search of Perez and described the

6

property to be seized as "[a]ny foreign objects to include methamphetamine, heroin, any other controlled substances and prescription medication  Any item deemed by qualified medical staff as being a foreign object located inside Inmate Perez' body shall be relinquished to a representative of the Salinas Valley State Prison Investigative Services Unit." *Id.* at 14.

### 4.  August 5-6 Trip To Natividad Medical Center

The Fourth Amendment claim that remains for adjudication pertains to the search at Natividad Medical Center, to which Perez was taken on August 5, 2016, so that the search warrant could be executed.  Defendant Moore showed the search warrant to medical staff at the hospital and explained why CDCR personnel were there as well as the procedure for executing the search warrant.  The medical staff decided first to do an x-ray and CT-scan.  Docket No. 40 at 16; *see* Docket No. 36 at 27.  Dr. Bass, an emergency room doctor, told lieutenant Moore that the CT-scan revealed five foreign objects in Perez's anal cavity.  Docket No. 36 at 29.  According to Perez, lieutenant Moore wanted Dr. Bass to physically remove the objects pursuant to the search warrant, but Dr. Bass refused to perform a physical intrusion because of a risk to Perez's health if the objects contained drugs and were perforated during removal.  *Id.* at 29-30.  Dr. Bass said he would prescribe laxatives and "'let nature take its course.'"  *Id.* at 30.  (Defendants present evidence that they did not try to direct the doctor's course of action.  At the summary judgment stage, the court accepts the nonmoving party's version as true.)

According to Perez, nurse Clement came into the room about fifteen minutes later with large containers and began pouring the laxative into Perez's mouth, and told him he would have to drink all of the laxative.  *Id.*  (Perez's hands were secured so he could not hold the cup to drink the liquid.) After she had given him a cupful, Perez said he was not ready for more; Clement left the room and returned a few minutes later to pour more laxative into Perez's mouth.  She repeated this at least seven times in ten minutes.  *Id.* at 32.  Eventually, Perez protested that he needed more time because his stomach could not take any more liquid without vomiting.  Clement made an unsympathetic comment about him stalling and left the room.  *Id.*  Perez closed his eyes and tried to sleep, but ISU officer Peffley yelled at him and wouldn't let him sleep.  *Id.*  Nurse Clement returned and Perez

7

United States District Court
Northern District of California

1   complained that the officers were harassing him; Clement turned to Peffley and gave him the

2   laxative to administer to Perez, saying that she "'wasn't going to deal with this'" and leaving the

3   room.  *Id.* at 33.  Peffley poured the laxative into Perez's mouth until he began coughing and

4   choking, and then repeated the procedure.  *Id.*  (Defendants present evidence that they did not take

5   part in the administration of the laxative and did not yell at Perez.  At the summary judgment stage,

6   the court accepts the nonmoving party's version as true.)

7         Although denying that he yelled at Perez, Peffley states that he did talk to Perez in a "normal

8   tone" to try to keep him awake to expedite things.  Docket No. 40-6 at 7.  Peffley was trying to keep

9   Perez awake because the prison would not let Perez return with the contraband in him and they

10  "were in the emergency room.  The waiting room was very crowded, and people were waiting for a

11  bed." *Id.* at 7-8.

12        According to Perez, lieutenant Moore informed the officers at the hospital in the early hours

13  of August 6 that Perez would have to return to the prison because the hospital was not going to admit

14  Perez.  Docket No. 36 at 38.  But then Moore learned the medical staff at the prison would not allow

15  him to be returned to the prison in his current state.  *Id.* at 35.  Lieutenant Moore spoke with nurse

16  Clement, who told Perez she would administer an enema to him.  *Id.*  He objected and asked to see

17  the doctor, but nurse Clement refused to call the doctor.  *Id.*  According to Perez, ISU officers

18  Salgado and Peffley stripped off his clothes to expose his buttocks and bent him over while Clement

19  administered the enema without any lubrication.  *Id.*  According to Perez, the enema tore his anus

20  and caused it to bleed.  *Id.*  (Defendants present evidence that they did not direct the medical staff's

21  treatment, that Perez was not happy but agreed to the laxative and enema, and that they did not

22  restrain Perez.  At the summary judgment stage, the court accepts the nonmoving party's version as

23  true.)

24        After receiving the enema, Perez started producing bowel movements at about 4:00 a.m. on

25  August 6.  Within a few hours, Perez had produced several bowel movements containing a total of

26  five bindles of contraband.  Docket No. 40-7 at 8.  Two bindles contained methamphetamine, one

27  contained heroin, one contained marijuana, and one contained three one-hundred-dollar bills.

28  Docket No. 40-1 at 3-4 (Smith Decl.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

After his bowel movements produced the contraband, Perez was returned to the prison at about 9:50 a.m. on August 6, where he was removed from CSW.  Docket No. 40-7 at 8 (Salgado Decl.).

As a result of the contraband incident, Perez pled no contest and was convicted of possession of controlled substances in prison.  Perez received a prison sentence totaling two years (i.e., one year for the drug possession, doubled because he had suffered a prior conviction).  Docket No. 40-12 at 4.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California because the events and omissions giving rise to the complaint occurred in Monterey County, located in the Northern District.  *See* 28 U.S.C. §§ 84, 1391(b).  This court has federal question jurisdiction over this action under 42 U.S.C. § 1983.  *See* 28 U.S.C. § 1331.

**LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his or her] own affidavits, or by the

United States District Court
Northern District of California

1   'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing

2   that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (citations omitted).

3        A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is

4   based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v.*

5   *McDonald,* 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as

6   opposing affidavit where, even though verification was not in conformity with 28 U.S.C. § 1746,

7   plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not

8   based purely on his belief but on his personal knowledge).  Here, Perez's amended complaint was

9   signed under penalty of perjury so the facts therein are considered as evidence for purposes of

10  deciding the motion.  *See* Docket No. 36-1 at 8.

11       The court's function on a summary judgment motion is not to make credibility

12  determinations nor to weigh conflicting evidence with respect to a disputed material fact.  *See T.W.*

13  *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence

14  must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn

15  from the facts must be viewed in a light most favorable to the nonmoving party.  *Id.* at 631.

16

17                                     **DISCUSSION**

18    A.  Qualified Immunity Principles

19       The defense of qualified immunity protects "government officials . . . from liability for civil

20  damages insofar as their conduct does not violate clearly established statutory or constitutional rights

21  of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

22  The doctrine of qualified immunity attempts to balance two important and sometimes competing

23  interests: "the need to hold public officials accountable when they exercise power irresponsibly and

24  the need to shield officials from harassment, distraction, and liability when they perform their duties

25  reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The doctrine thus intends to take into

26  account the real-world demands on officials in order to allow them to act "swiftly and firmly" in

27  situations where the rules governing their actions are often "voluminous, ambiguous, and

28  contradictory."  *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citation omitted).  "The

purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.*

To determine whether a government official is entitled to qualified immunity, courts must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236.

"An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration and omission in original; citation omitted). This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.* (alteration in original; internal quotation marks omitted).

B.  Defendants Are Entitled To Qualified Immunity on The Fourth Amendment Claim

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV.  The issue here is whether the *manner* of the search conducted at Natividad Medical Center was constitutionally impermissible.[2]

---

[2] The complaint does not allege that there was not probable cause for the search.  Even if Perez intended to include a claim there was not probable cause, such a claim plainly fails at the summary judgment stage.  The undisputed evidence shows that: (1) prison officials directly observed and video-recorded a mouth-to-mouth passage of an object from Perez's girlfriend to Perez during a kiss; (2) the girlfriend admitted that she had passed drugs to Perez; (3) prison officials observed Perez taking steps to resist excreting the contraband they had seen him consume (e.g., minimizing food and water consumption and straining to limit his bowel movements); and (4) before the laxatives or enema were administered, a CT-scan showed five foreign objects in Perez's alimentary canal. And, before the search at Natividad, prison officials had obtained a search warrant, meaning that a judicial officer had determined that there was probable cause for the search.

United States District Court
Northern District of California

An intrusive body search "requires 'a more substantial justification' than other searches. *George v. Edholm*, 752 F.3d 1206, 1217 (9th Cir. 2014). There are three primary factors in deciding the reasonableness of a body search, at least in the context of a search of an arrestee: (1) "'the extent to which the procedure may threaten the safety or health of the individual,'" (2) "'the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity,'" and (3) "'the community's interest in fairly and accurately determining guilt or innocence.'" *Id.* at 1217 (quoting *Winston v. Lee*, 470 U.S. 753, 761-62 (1985) (rejecting state's request for a court order requiring a suspect to undergo surgery to remove a bullet from the suspect's chest)). "The failure to obtain a warrant, while not necessarily fatal to a claim of reasonableness, is also relevant." *Id.*; *see also United States v. Fowlkes*, 804 F.3d 954-61 (9th Cir. 2015) ("while visual cavity searches that do not require physical entry into a prisoner's body are generally permissible without a warrant during the jail intake process, physical cavity searches generally are not"); *id.* at 958 ("forcible removal of an unidentified item of unknown size from [suspect's] rectum by officers without medical training or a warrant violated his Fourth Amendment rights").

Here, there is minimal evidence as to any danger to Perez's health and safety from the procedures performed in the hospital by medical personnel. Neither Perez nor the officers provides evidence of the general risks of x-rays, CT-scans, laxatives or enemas. Perez states in his verified amended complaint that it was unpleasant to be fed cup after cup of the voluminous quantity of laxative prescribed for him, Docket No. 36 at 30-32, but that transient discomfort cannot reasonably be viewed as a threat to his safety or health. His evidence that some defendants removed his clothes to expose his buttocks (at a time when he was in mechanical restraints and could not use his hands to do so himself) and held him during the administration of the enema does not show a threat to his safety or health. Perez does present evidence that the particular method used by the nurse to administer the enema (i.e., without lubrication) caused his anus to begin bleeding that day and occasionally in the months thereafter. *Id.* at 35-36. This might allow a jury to find the particular action of the nurse to have posed a danger to his health – although it appears speculative as to whether the nurse's activities or Perez's activities caused the anal bleeding – but the nurse is no longer a defendant in this action. Perez does not present evidence that would allow a reasonable

1    trier of fact to conclude that the correctional defendants controlled the manner in which the nurse
2    inserted the enema, and does not present any evidence that would allow a reasonable trier of fact to
3    conclude that enemas in general are dangerous to patients' safety or health.

4            The extent of the intrusion on Perez's "dignitary interests in personal privacy and bodily
5    integrity" was significant.   The intrusion was considerably less, however, than the intrusion
6    described as "extreme" in *George*, 752 F.3d at 1217, where a doctor sedated an arrestee, inserted an
7    anoscope and long forceps into the arrestee's rectum to retrieve a baggie of cocaine, and inserted an
8    NG tube into the arrestee's stomach to feed a gallon of liquid laxative that triggered a complete
9    evacuation of the bowels.   Unlike in *George*, there was no use of an anoscope or effort to retrieve
10   the contraband with forceps.   *See also id.* at 1218-19 (collecting intrusive-search cases).   *George* is
11   distinguishable also in that the intrusive search occurred without "other 'reasonable steps to mitigate
12   [the arrestee's] anxiety, discomfort, and humiliation,'" and was done to a person not yet convicted
13   of a criminal offense.   *Id.* at 1281; *see also United States v. Cameron*, 538 F.2d 254, 258 (9th Cir.
14   1976) (warrantless search that consisted of digital rectal exam, laxative, and two enemas of person
15   stopped at border crossing was unreasonable under the Fourth Amendment).   Those factors are not
16   present here, as reasonable steps had been taken to mitigate Perez's anxiety, discomfort, and
17   humiliation.   The several days of CSW, the laxative offered to Perez at the prison, and the laxative
18   used on an earlier visit to the hospital provided him an opportunity to defecate the foreign bodies
19   without need for any intrusion at the hospital on August 6.   Perez presents no evidence that he
20   wanted to, but was physically incapable of, defecating the contraband before the laxatives and
21   enema were administered on August 6.   Unlike in *George*, there is evidence in this case that the
22   intrusions at the hospital occurred after Perez had taken affirmative steps to resist allowing the
23   foreign bodies to come out naturally.

24           The third factor, "'the community's interest in fairly and accurately determining guilt or
25   innocence,'" applies more easily when the person being searched is an arrestee rather than someone
26   already in prison.   In *George*, the court noted that the community has a strong interest in prosecuting
27   those who are selling cocaine base, "[b]ut a jury could reasonably conclude that the baggie of
28   cocaine base could have been recovered through far less intrusive means," such as by keeping the

United States District Court
Northern District of California

13

1  person "in the hospital, administer[ing] laxatives, and monitor[ing] his bowel movements." *George*,

2  752 F.3d at 1220.  This quoted passage effectively endorses all the means used to search Perez, other

3  than the enema.

4       The fact that Perez was a prisoner is another factor that must be considered in determining

5  whether the search was unreasonable.  In addition to the determination of guilt or innocence that

6  applies when the person being searched is an arrestee, there is a prison security issue when the

7  person being searched is an existing prisoner.  Courts have long recognized the dangers that

8  introducing contraband into a prison can pose to inmates and staff.  Defendants present undisputed

9  evidence that the introduction of drugs into the prison presents not just the possibility of the inmate

10 abusing drugs, but also can lead to violence within the prison.  The Supreme Court has recognized

11 the significant connection between drugs and prison violence.  *Florence v. Bd. of Chosen*

12 *Freeholders*, 566 U.S. 318, 332 (2012) ("The use of drugs can embolden inmates in aggression

13 toward officers or each other; and, even apart from their use, the trade in these substances can lead

14 to violent confrontations.").

15      Lastly and most importantly, the defendants had obtained a warrant for the search of Perez.

16 Courts repeatedly have stressed the importance of obtaining a warrant for a search.  In the warrant

17 application seeking judicial approval of a search, defendant Salgado described the efforts from July

18 31 through August 4 to obtain the suspected contraband and explicitly stated what was intended for

19 Perez: Perez would be taken to a hospital and a "body cavity search will be conducted in a medically

20 approved manner by a licensed physician or other licensed medical professional.  Said person(s) are

21 authorized by this court to conduct a body cavity search of the above listed person without their

22 consent.  Said search does not include surgical procedures accomplished with scalpels, but is rather

23 a probing type of search."  Docket No. 40-7 at 17.  That application was approved by a judicial

24 officer before the search was undertaken.

25      On the evidence in the record, defendants are entitled to qualified immunity because their

26 conduct did not violate a constitutional right.  Moreover, even if there was a triable issue as to

27 whether the search at Natividad was constitutionally impermissible, defendants are entitled to

28 qualified immunity because it cannot be said "that any reasonable official in [their] shoes would

United States District Court
Northern District of California

14

have understood that [they were] violating" Perez's Fourth Amendment rights.  *Sheehan*, 135 S. Ct. at 1774.  At the time Perez was given x-rays, a CT-scan, laxatives, and an enema at Natividad, a search warrant had been obtained by defendants who had tried for days to obtain the contraband with less intrusive means.  Perez has not identified a case where a search pursuant to a warrant was held unconstitutional in circumstances comparable to the bodily search done to him. Given these circumstances, defendants could have believed reasonably, even if mistakenly, that the search was constitutionally permissible.  They therefore are entitled to judgment as a matter of law in their favor on the defense of qualified immunity.

C.  *Heck* Does Not Bar The Fourth Amendment Claim

Defendants urge that Perez's Fourth Amendment claim is barred by the doctrine from *Heck v. Humphreys*, 512 U.S. 477, 487 (1994).  *Heck* held that a plaintiff cannot maintain a § 1983 claim for damages if success on that claim necessarily would imply the invalidity of his conviction or sentence, unless the conviction or sentence already has been invalidated.

In the Ninth Circuit, a conviction resting on a guilty plea or no-contest plea will not pose a *Heck* bar to a Fourth Amendment claim based on the manner of a search because the "convictions derive from the[] plea[], not from verdicts obtained with supposedly illegal evidence. The validity of the[] conviction[] does not in any way depend upon the legality" of the challenged search.  *Ove v. Gwinn*, 264 F.3d 817, 823 (9th Cir. 2001) (Fourth Amendment claim for unreasonable blood tests not *Heck*-barred because the evidence was not introduced when the defendants pled guilty and no-contest to DUI charges); *see also Lockett v. Ericson*, 656 F.3d 892, 896-97 (9th Cir. 2011); *Roberts v. City of Fairbanks*, 947 F.3d 1191, 1210 n.2 (9th Cir. 2020) (Ikuta, J., dissenting).  Of course, even when *Heck* does not apply, a plaintiff under a still-valid conviction would not be able to recover damages for the imprisonment that flowed from conviction that was the product of an allegedly unlawful search.  *See Heck*, 512 U.S. at 487 n.7 ("the § 1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury, *see Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 308 (1986), which, we hold today, does not encompass the 'injury' of being convicted and imprisoned (until his conviction has been overturned").

United States District Court
Northern District of California

United States District Court
Northern District of California

The *Heck* rule does not apply in this case because Perez's conviction for possession of controlled substances rests on a no-contest plea rather than a determination of guilt following a trial. Defendants do not show that the drugs Perez possessed were introduced when he pled no-contest. *See Ove*, 264 F.3d at 823.  Defendants' *Heck* argument fails.

D. Eighth Amendment Claim

The doctrine of qualified immunity proves pivotal for the Eighth Amendment claim just as it did for the Fourth Amendment claim.  As explained below, an examination of the Ninth Circuit cases that mark the way for the analysis of the Eighth Amendment claim reveals that the existence of a legitimate penological purpose for continuous lighting either negates, or at least casts doubt on whether there is, an Eighth Amendment problem.  This lack of clarity about the legal relevance of a legitimate penological purpose leads the court to conclude that defendants are entitled to qualified immunity.

1. Continuous Illumination And The Eighth Amendment

The Constitution does not mandate comfortable prisons, nor does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.  *See Helling v. McKinney*, 509 U.S. 25, 31 (1993).  The Eighth Amendment imposes duties on prison officials to provide prisoners with the basic necessities of life, such as food, clothing, shelter, sanitation, medical care, and personal safety.  *See Farmer*, 511 U.S. at 832.  A plaintiff alleging that conditions of confinement amount to cruel and unusual punishment prohibited by the Eighth Amendment must satisfy a two-prong test.  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  First, a plaintiff must satisfy an objective test showing that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.  In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, courts consider the circumstances, nature, and duration of the deprivation.  *See Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).  Second, the plaintiff must show that the prison

16

United States District Court
Northern District of California

1    official inflicted the deprivation with a "sufficiently culpable state of mind," that is, with "deliberate

2    indifference" to his health or safety. *Farmer*, 511 U.S. at 834. The deliberate indifference standard

3    requires that the official know of and disregard an excessive risk to inmate health or safety. *See id.*

4    at 837. The official must both be aware of facts from which the inference could be drawn that a

5    substantial risk of serious harm exists, and he must also draw the inference. *See id.*

6          "'Adequate lighting is one of the fundamental attributes of "adequate shelter" required by

7    the Eighth Amendment. Moreover, there is no legitimate penological justification for requiring

8    inmates to suffer physical and psychological harm by living in constant illumination.'" *Grenning*

9    *v. Miller-Stout*, 739 F.3d 1235, 1238 (9th Cir. 2014) (quoting *Keenan v. Hall*, 83 F.3d 1083, 1090

10   (9th Cir. 1996) (triable issues existed on the Eighth Amendment claim based on Keenan's evidence

11   that the continuous illumination of his disciplinary segregation cell for *six months* had caused grave

12   sleeping problems as well as other mental and physical problems)). Continuous lighting of a

13   prisoner's cell "can satisfy the objective part" of the Eighth Amendment test. *Id.*

14         In *Grenning*, the court determined that there were triable issues on the subjective part of the

15   Eighth Amendment test. Grenning was placed in segregated housing for about 13 days during an

16   investigation into a fight in which he was involved. *Id.* at 1237. In the segregated housing unit, the

17   cells were illuminated 24 hours a day. *Id.* Grenning presented evidence that the light was so bright

18   he could not sleep even with a covering over his eyes and that the lighting caused recurring

19   migraines as well as other pain and disorientation. *Id.* at 1238. Grenning submitted a grievance

20   informing prison officials that he could not sleep and had headaches as a result of the continuous

21   lighting. *Id.* Prison officials offered general security concerns as justification for the constant

22   illumination, such as the need to assess "the baseline behavior" of inmates who were considered

23   high risk to staff, other offenders, and themselves (even though some inmates were in the unit for

24   protection against other inmates); the need for guards to do welfare checks every 30 minutes with

25   minimal disruption to inmates; and the need for guards to be able to approach and look into cells

26   without advanced warning. *Id.* at 1237. Of interest here is the Ninth Circuit's observation that

27   "[t]he precise role of legitimate penological interests is not entirely clear in the context of an Eighth

28   Amendment challenge to conditions of confinement." *Id.* at 1240. The Ninth Circuit pointed out

     that the Supreme Court had written that the test of *Turner v. Safley*, 482 U.S. 78 (1987), "which

requires only a reasonable relationship to a legitimate penological interest to justify prison regulations, does not apply to Eighth Amendment claims," yet also had looked at the existence of a legitimate penological justification "in considering whether adverse treatment is sufficiently gratuitous to constitute punishment for Eighth Amendment purposes." *Grenning*, 739 F.3d at 1240 (citations omitted).  In both *Chappell v. Mandeville*, 706 F.3d 1052 (9th Cir. 2013), and *Keenan*, 83 F.3d at 1090, the Ninth Circuit had "referred to possible legitimate penological interests when considering allegations that continuous lighting violated the Eighth Amendment." *Grenning*, 739 F.3d at 1240.  The *Grenning* court ultimately did not decide whether legitimate penological interests could defeat an otherwise valid Eighth Amendment claim because the defendants in that case had not made such a showing with regard to the constant illumination of Grenning's cell.  *Id.* at 1240-41.

The other significant case from the Ninth Circuit is *Chappell v. Mandeville*, 706 F.3d 1052 (9th Cir. 2013), in which the court determined that prison officials were entitled to qualified immunity against an Eighth Amendment claim based on a contraband watch program very similar to that used on Perez.  Chappell was put on contraband watch a day after his girlfriend visited him and left a hairpiece in the trashcan that tested positive for cocaine residue.  *Id.* at 1054.  Prison officials searched Chappell's cell, found methamphetamine, and placed him on a contraband watch that lasted for seven days, using a procedure that (like Perez's CSW) involved temporary confinement in highly restrictive conditions that included searching his bowel movements for contraband.  *See id.* at 1055-56.  The cell was continuously illuminated.  *Id.*  The court stated that *Keenan* "did not clearly establish" that the continuous lighting in Chappell's contraband-watch cell was unconstitutional because Chappell was only in the cell for seven days and did not claim that he was sleep deprived, whereas the inmate in *Keenan* claimed sleep deprivation over a period of six months.  *Id.* at 1057-58.  Moreover, unlike *Keenan*, a "clear penological purpose" for the constant illumination was offered by the defendants in *Chappell*: prison officials "suspected that Chappell had secreted contraband in his body and kept the lights on so that they could monitor Chappell 24 hours a day to prevent him from disposing of the contraband."  *Id.* at 1058.  The court also noted that other cases provided no more clear guidance to defendants because the continuous-lighting claims were very fact-specific and had mixed results, with a "large majority of the courts . . .

conclud[ing] that there was no Eighth Amendment violation." *Id.* at 1058-59 (collecting cases). The court determined that the defendants were entitled to qualified immunity because, at the time the contraband watch took place in 2002, no court had ruled on whether a contraband watch constitutes a legitimate penological purpose that would justify continuous illumination of an inmate's cell. *Id.* at 1059.

The law has not become any clearer since *Grenning* and *Chappell* on the constitutionality of continuous illumination of a cell during contraband watch.  Nor has it become clearer how the existence of a legitimate penological purpose for officials' actions affects an Eighth Amendment claim in general.  In fact, the most recent case on the matter determined that the absence of a legitimate penological purpose for the actions was a necessary part of an Eighth Amendment claim. *See Bearchild v. Cobban*, 947 F.3d 1130, 1144 (9th Cir. 2020) (holding that an Eighth Amendment violation is established when prisoner "proves that a prison staff member, acting under color of law and *without legitimate penological justification*, touched the prisoner in a sexual manner or otherwise engaged in sexual conduct for the staff member's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the prisoner") (emphasis added).

### 2.   The Continuous Illumination Experienced By Perez

Turning now to Perez's case, it is undisputed that (1) the lights were on continuously during Perez's 6-day stay in the CSW cell; (2) Perez did not complain to defendants about the lighting; (3) Perez was in the CSW cell to be monitored after he was observed receiving contraband from his girlfriend during a visit; (4) the lights remained on so that correctional staff could maintain continuous visual monitoring of Perez to see if he attempted to hide or dispose of the contraband that he was believed to have swallowed; and (5) continuous illumination allows staff to see a medical emergency more quickly.

Perez fails to show a triable issue in support of his claim that the continuous lighting of the CSW cell violated his Eighth Amendment rights.  The lighting in Perez's cell was the same continuous lighting that existed in the contraband watch cell in *Chappell*, and prison officials offered the same penological purpose for the continuous lighting in both cases:  they needed to continuously watch the inmate to be sure that he did not hide or dispose of the contraband they suspected he had

on or in his person.  As the court noted in *Chappell*, most courts have concluded there is no Eighth Amendment violation when continuous lighting is necessary for monitoring of the prisoner.  706 F.3d at 1059.   Viewing the evidence in the light most favorable to Perez, there was not an Eighth Amendment violation, given the need for continuous monitoring of the inmate who was suspected of consuming contraband immediately before the CSW procedure was implemented.  Although the suspicion that an inmate has ingested contraband may be weak in some cases, that was not the situation here.  Prison officials were on very firm footing with their suspicion because Perez had been directly observed receiving the contraband in his mouth, his receipt of contraband was captured on a video-recording, and his meth-carrying girlfriend had admitted she passed the contraband capsule to him.  No reasonable jury could conclude that the continuous lighting used to monitor Perez during the CSW violated Perez's Eighth Amendment rights.

Defendants prevail on the first prong of the *Saucier* test because there was not a violation of Perez's Eighth Amendment right to be free from cruel and unusual punishment.  *See Saucier*, 533 U.S. at 201 (threshold question in qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?").  Even assuming, arguendo, that there was an Eighth Amendment violation, defendants prevail on the second prong of the qualified immunity test because there was no clearly established law controlling the specific facts of this case.

"An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it,' meaning that 'existing precedent . . . placed the statutory or constitutional question beyond debate.'"  *Sheehan*, 135 S. Ct. at 1774 (alteration and omission in original; citation omitted); *see, e.g., Carroll v. Carman*, 574 U.S. 13, 16–18 (2014) (law not clearly established whether officer may conduct a "knock and talk" at any entrance to a home that is open to visitors, rather than only at the front door); *Hines v. Youseff*, 914 F.3d 1218, 1229 (9th Cir. 2019) (defendants entitled to qualified immunity where "the specific right that the inmates claim in these cases—the right to be free from heightened exposure to Valley Fever spores—was not clearly established at the time"); *Horton v. City of Santa Maria*, 915 F.3d 592, 601–02 (9th Cir. 2019) (officer entitled to

United States District Court
Northern District of California

qualified immunity on failure-to-protect claim from pretrial detainee who had attempted to hang himself because there was conflicting information as to whether he was suicidal and the case law "was simply too sparse, and involved circumstances too distinct from those in this case, to establish that a reasonable officer would perceive a substantial risk that [detainee] would imminently attempt suicide"). The Supreme Court "has repeatedly told courts—and the Ninth Circuit in particular— not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (officer entitled to qualified immunity for shooting a woman who was armed with a large knife, was ignoring officers' orders to drop the weapon, and was within striking distance of her housemate; prior cases on excessive force did not clearly establish that it was unlawful to use force under these circumstances, where officer may not have been in apparent danger but believed woman was a threat to her housemate).

Here, *Keenan*, *Chappell*, and *Grenning* did not clearly establish a constitutional right to avoid constant lighting while on CSW. It would not have been clear to a reasonable official in defendants' positions that they could not leave the lights on 24 hours a day to monitor an inmate on CSW. The CSW is limited in length – normally 72 hours, with the possibility of extension – and is done for a very specific purpose. Unlike the usual disciplinary housing or segregated housing situation, the CSW stay ends in a matter of hours or days rather than weeks or months due to basic human biology. Given the limited timeframe of CSW, plus the need to maintain constant visual surveillance to be sure the inmate does not hide or dispose of the contraband he is suspected of concealing, a reasonable officer in defendants' positions could have thought it lawful to leave the lights on continuously during Perez's CSW.

The facts are nearly identical to those in *Chappell*, where the court did not find an Eighth Amendment violation, so that case did not provide notice to defendants that their conduct was unlawful. Perez identifies no case that has clarified the law on his fact pattern since the time that *Chappell* was decided. *Grenning* did not overrule *Chappell;* instead, *Grenning* noted that it was unclear whether a legitimate penological purpose would justify an otherwise unconstitutional condition of confinement. Therefore, even if a constitutional violation did occur, defendants are entitled to qualified immunity on the Eighth Amendment claim because it would not have been clear

to them that their actions were unlawful.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED.  Docket No. 40.  Defendants are entitled to judgment as a matter of law on plaintiff's claims.  The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: May 29, 2020

_____
SUSAN ILLSTON
nited States District Judge